UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LUCY PINDER, et al.,

      Plaintiffs,

      v.

CLUB WAX, LLC, et al.,

      Defendants.

CIVIL ACTION NO.
1:22-CV-03164-JPB

## <u>ORDER</u>

Before the Court is the Amended Motion for Default Judgment filed by

Lucy Pinder, Alana Marie Souza a/k/a Alana Campos, Andra "Ana" Cheri

Moreland, Brenda Geiger, Jessica "Charm" Killings and Rosa Acosta ("Plaintiffs")

against Club Wax, LLC and Jamie Ortiz ("Defendants") [Doc. 20].  This Court

finds as follows:

## FACTUAL BACKGROUND

Plaintiffs are professional models residing diversely across the United States

and the United Kingdom.  [Doc. 1, pp. 3–4].  Plaintiffs all individually earn a

livelihood modeling and licensing their respective images to companies, magazines

and individuals for advertising purposes.  <u>Id.</u> at 4–5.  Club Wax, LLC ("Club

Wax") is a domestic limited liability company formed under Georgia state law and

registered to conduct business in Georgia, where it operates Club Wax in Atlanta. <u>Id.</u> at 4.  Jamie Ortiz is the Principal of Club Wax, LLC.  <u>Id.</u>

Plaintiffs allege that their images, photos and likenesses (collectively, "Images") were intentionally misappropriated and altered by Defendants to give the appearance that Plaintiffs worked for, endorsed or were otherwise affiliated with Defendants.  <u>Id.</u> at 5.  Plaintiffs also assert that this misappropriation occurred without Plaintiffs' knowledge or consent, and without any remuneration.  <u>Id.</u> Plaintiffs aver that such misappropriation is harmful to Plaintiffs, as their careers in the modeling industry place a high degree of value on their goodwill and reputation, and part of advancing their individual brands includes being selective about the companies and brands for which they model.  <u>Id.</u>  Plaintiffs allege that Defendants' misappropriation of their Images has caused Plaintiffs to suffer both monetary damages and reputational harm.  <u>Id.</u>

## PROCEDURAL HISTORY

The instant action was initiated on August 10, 2022, when Plaintiffs filed the Complaint.  [Doc. 1].  Ortiz was served on October 22, 2022, and his answer was due November 14, 2022.  [Doc. 11].  Club Wax, LLC was served on December 13, 2022, and its answer was due on January 3, 2023.  [Doc. 13].  When Defendants

failed to answer, the Clerk entered default against them on February 14, 2023. Plaintiffs filed a Motion for Default Judgment on April 27, 2023. [Doc. 17].

This Court denied Plaintiffs' original Motion for Default Judgment, [Doc. 17], without prejudice on November 8, 2023, because the motion lacked adequate support. [Doc. 18]. However, the Court permitted Plaintiffs to refile a properly supported motion within thirty days. Id. Plaintiffs failed to file an amended motion within the timeframe contemplated by the order. As a result, on January 5, 2024, the Court directed Plaintiffs to file a properly supported motion for default judgment—or a notice explaining why Plaintiffs were not seeking default judgment at this time—no later than January 12, 2024. [Doc. 19]. Plaintiffs then filed the instant Amended Motion for Default Judgment, [Doc. 20], and accompanying memorandum of law, [Doc. 20-1], on January 12, 2024.

Plaintiffs' Amended Motion for Default Judgment is now ripe for review.

## ANALYSIS

### I. Legal Standard

When a defendant fails to file an answer or otherwise defend, a court may enter judgment by default. Fed. R. Civ. P. 55(b)(2). As a general rule, default judgments are disfavored, Surtain v. Hamlin Terrace Found., 789 F.3d 1239, 1244–45 (11th Cir. 2015), and "[a] party is not entitled to a default judgment merely

because a default has been entered." Senator-Rudat v. Southard, No. 20-CV-02131, 2021 WL 9721150, at *1 (N.D. Ga. Dec. 13, 2021) (internal quotation marks omitted). Rather, "[e]ntry of default judgment is only warranted when there is 'a sufficient basis in the pleadings for the judgment entered.'" Surtain, 789 F.3d at 1245 (citation omitted).

To determine whether the pleadings provide a sufficient basis for entry of default judgment, courts apply the same analysis as if evaluating a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss because there can be no default judgment based on a complaint that fails to state a clam. See id. (citing Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1370 n.41 (11th Cir. 1997)). "Conceptually, then, a motion for default judgment is like a reverse motion to dismiss for failure to state a claim," and the Court must determine "whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. at 1244–45. "This plausibility standard is met 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. at 1245 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

**II. Liability**

In their amended motion, Plaintiffs move for default judgment on five of the claims included in their complaint:  False Adverting under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); False Association under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); Common Law Right of Publicity pursuant to Georgia common law; Violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A § 10-1-370 et seq.; and Defamation pursuant to Georgia common law.

   a. <u>False Advertising, 15 U.S.C. § 1125(a)(1)(B)</u>

This Court will first analyze whether Plaintiffs have stated a claim for relief under 15 U.S.C. § 1125(a)(1)(B), found in Section 43 of the Lanham Act (the "Act").  To bring a false advertising claim, a plaintiff must allege:  "(1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) [Plaintiffs have] been—or [are] likely to be—injured as a result of the false advertising." <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004).

Regarding the first element, "[t]he false statement necessary to establish a . . . violation generally falls into one of two categories:  (1) commercial claims that

are literally false as a factual matter; and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998). "Statements that have an unambiguous meaning, either facially or considered in context, may be classified as literally false." Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1308 (11th Cir. 2010) (citing United Indus. Corp., 140 F.3d at 1180). Plaintiffs alleged that Defendants' advertisements "were false and misleading . . . because no Plaintiff ever worked at or was in any way associated or affiliated with Club Wax, nor had they agreed to appear in Club Wax's advertisements." [Doc. 1, p. 15]. Because Plaintiffs allege facts, accepted as true, that they were not connected to Club Wax and that Defendants' advertisements unambiguously depicted them as such, Plaintiffs allege sufficient facts to show that Club Wax's advertisements were false or misleading.

For consumer confusion, Plaintiffs alleged that, "[g]iven the false and misleading nature of [Defendants'] advertisements, they had the capacity to and did deceive consumers." Id. As stated previously, Defendants' advertisements were clearly intended to communicate to the public at large that Plaintiffs were in some way connected to Club Wax. Plaintiffs alleged sufficient facts to demonstrate that Defendants' advertisements were capable of deceiving consumers

into believing that a nonexistent relationship between Plaintiffs and Club Wax existed.

    To sufficiently plead the third element of their false advertising claim, Plaintiffs "must [allege facts] demonstrat[ing] that '[Defendants'] deception is likely to influence the purchasing decision'" of consumers and may do so "by showing that '[D]efendants misrepresented an inherent quality or characteristic of the product.'" Osmose, Inc., 612 F.3d at 1319.  Plaintiffs alleged that Defendants' deception materially affected "purchasing decisions of consumers who attended Club Wax," [Doc. 1, p. 15], and that Defendants "used Plaintiffs' [I]mages . . . to receive certain benefits . . . including but not limited to:  monetary payments; . . . notoriety; publicity; and an increase in business revenue, profits, and income" because the Images were intended to entice customers to patronize Club Wax due to their purported association with Plaintiffs. Id. at 13.  Plaintiffs have thus alleged sufficient facts to support the third element of this claim.

    The fourth element of a false advertising claim requires that the misrepresented product or service affects interstate commerce.  Plaintiffs alleged that the advertisements appropriating Plaintiffs' Images were posted on various social media platforms and even the Club Wax website.  [Doc. 1, p. 15].  Since the internet is considered an instrumentality of interstate commerce, Plaintiffs have

sufficiently alleged facts to support this element of their False Advertising claim. See United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004) ("The internet is an instrumentality of interstate commerce."); Gibson v. BTS N., Inc., No. 16-24548-CIV, 2018 WL 888872, at *5 (S.D. Fla. Feb. 14, 2018) (finding the interstate commerce element of a false advertising claim met when a plaintiff contended that defendants used the internet to market their services).

With respect to the final element of Plaintiffs' false advertising claim, Plaintiffs must allege facts to show that they have suffered actual harm or that they are likely to be harmed by Defendants' false advertising. Plaintiffs have alleged harm resulting from Defendants' advertisements, given their careers in modeling, their reputations and "the negative connotations of false impression of association with Club Wax." [Doc. 1, p. 14]. Specifically, Plaintiffs claimed that Club Wax's "improper and illegal use of Plaintiffs' Images [has] caused each Plaintiff to suffer substantial monetary damages and harm to reputation," particularly because "Plaintiffs' careers in the modeling industry place a high degree of value on their goodwill and reputation, which is critical to maximize their earning potential, book modeling contracts, and establish each of their individual brands." Id. at 5. Plaintiffs' allegations are sufficient to show that they have been or are likely to be injured from Defendants' false advertising.

In sum, Plaintiffs have stated a false advertising claim under 15 U.S.C. § 1125(a)(1)(B).

b. False Association, 15 U.S.C. § 1125(a)(1)(A)

To state a claim for false association, Plaintiffs must allege facts that show "(1) [they] had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997). "[A] plaintiff need not have a registered mark." Tana v. Dantanna's, 611 F.3d 767, 773 (11th Cir. 2010). "[T]he use of another's unregistered, *i.e.*, common law, trademark can constitute a violation of [§ 1125(a)(1)(A)] where . . . the alleged unregistered trademarks used by the plaintiff are so associated with its goods that the use of the same or similar marks by another company constitutes a [false] representation that its goods came from the same source." Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512–13 (11th Cir. 1984) (internal quotations and citations omitted).

Regarding the first element, Plaintiffs asserted that Defendants appropriated their images and likenesses and stated their substantial work in the modeling industry, significant followings on social media, and other noteworthy

9

achievements in the entertainment industry.  [Doc. 1, pp. 2, 4–13].   This is sufficient to support the first element of this claim.  See Lancaster v. Bottle Club, LLC, No. 17-CV-634, 2017 WL 3008434 (M.D. Fla. July 14, 2017) (finding that the plaintiffs alleged sufficient facts to survive a motion to dismiss where they "allege[d] the marks infringed upon were their own images or likenesses and, to show the degree of protection warranted for those marks, they allege[d] their extensive work history in the modeling industry and their numbers of followers on social media"); Krupa v. Platinum Plus, LLC, No. 16-CV-3189, 2017 WL 1050222 (M.D. Fla. Mar. 20, 2017) (finding that the plaintiffs stated a claim where they "allege[d] the marks infringed upon were their respective images or likenesses and, to show the degree of protection warranted for those marks, they allege[d] the number of followers on social media, which is substantial, and the extensive work they have done in the modeling industry").  Therefore, Plaintiffs have sufficiently alleged facts to show that their names and likenesses are protectable marks.

In order to successfully plead the second element, Plaintiffs must show "that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." Lone Star Steakhouse, 106 F.3d at 358.  Here, Plaintiffs alleged that the marks Defendants used were their exact images and likenesses.  See [Doc. 1, pp. 16, 17].  In addition

to alleging that the infringing marks were not only similar but the same, Plaintiffs claimed that consumers were actually confused "as to Plaintiffs' employment at or endorsement of Club Wax," given the use of their images and likenesses.  Id. at 17. Considering the above factors, Plaintiffs have stated a claim for false association under § 1125(a)(1)(A).

   c. <u>Violation of Right of Publicity</u>

A right of publicity claim in Georgia consists of the following elements:  (1) appropriation of another's name and likeness, (2) without consent and (3) for the financial gain of the appropriator.  <u>Martin Luther King, Jr. Ctr. for Soc. Change, Inc. v. Am. Heritage Prods., Inc.</u>, 296 S.E.2d 697, 703 (Ga. 1982).  With the right of publicity, "[t]he interest protected . . . is not so much a mental as a proprietary one, in the exclusive use of the plaintiff's name and likeness as an aspect of his identity." <u>Cabaniss v. Hipsley</u>, 151 S.E.2d 496, 504 (Ga. Ct. App. 1966) (internal quotation marks and citation omitted).

In this case, Plaintiffs have alleged sufficient facts to state a claim for violation of their rights of publicity.  First, Plaintiffs alleged that Defendants appropriated their likenesses and supported the allegation by claiming that Defendants took their images and likenesses and published them on their own website and social media accounts in advertisements.  [Doc. 1, p. 18].  Second,

Plaintiffs alleged that Defendants did not have Plaintiffs' consent to appropriate their likenesses.  See, e.g., id.  In fact, Plaintiffs claimed that Defendants never even sought to obtain their consent.  Id. at 19.  Finally, Plaintiffs asserted that Defendants appropriated their likenesses as part of an advertising campaign and for the purpose of attracting business at and generating revenue for Club Wax.  Id. at 18.

Plaintiffs further stated that they are "well-known professional models," which would support an allegation that use of their Images on strip club advertisements was for purposes of financial gain, as advertisements featuring familiar models could plausibly induce consumers to patronize a strip club.  Id. at 1.  Plaintiffs also claimed that Defendants sought "to reach a new audience," which further supports that Defendants were acting to achieve financial gains.  Id. at 18. In sum, Plaintiffs have alleged sufficient facts to show that Defendants violated their rights of publicity under Georgia law.

d. Violation of Georgia's Uniform Deceptive Trade Practices Act, O.C.G.A. § 10-1-372

A defendant violates the Uniform Deceptive Trade Practices Act ("UDTPA") when it:

> 'causes likelihood of confusion or of misunderstanding' or makes misrepresentations concerning approval or certification of a product, misrepresents the standard, quality or grade of a product, disparages the

goods of another by false or misleading representations of fact, or engages in other conduct similarly creating a likelihood of confusion or misunderstanding.

Energy Four, Inc. v. Dornier Med. Sys., Inc., 765 F. Supp. 724, 730 (N.D. Ga. 1991) (citing O.C.G.A. § 10–1–372(a)(2, 5, 7, 8, 12)).  This Court has recognized that the UDTPA "involves the same dispositive questions as the Federal Lanham Act. . . . [T]hus, the [C]ourt's analysis under the Lanham Act will dispose of the state law issues."  Id. at 731.  See Crossfit, Inc. v. Quinnie, 232 F. Supp. 3d 1295, 1309 (N.D. Ga. 2017) (granting a motion for default judgement where facts alleging likelihood of confusion were found for purposes of a false association analysis).

This Court has found that Plaintiffs alleged sufficient facts to state a claim for both false advertising and false association under 15 U.S.C. § 1125(a).  Given that "[15 U.S.C. § 1125(a)] and § 10–1–372(a)(2) of the UDTPA provide analogous causes of action governed by the same standard[,] . . . 'likelihood of confusion,'" Plaintiffs have stated a claim for violation of the UDTPA.  Kason Indus., Inc. v. Component Hardware Grp., Inc., 120 F.3d 1199, 1203 (11th Cir. 1997).

e. Defamation – Libel

"Libel," the type of defamation at issue in this case, is the "false and malicious[1] defamation of another, expressed in print, writing, pictures, or signs, tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." O.C.G.A. § 51-5-1(a). A plaintiff must prove four elements to establish a claim for defamation: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." StopLoss Specialists, LLC v. VeriClaim, Inc., 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (quoting Smith v. DiFrancesco, 802 S.E.2d 69, 72 (Ga. Ct. App. 2017)).

Beginning with the first element of a defamation claim, the Court has already determined that Plaintiffs sufficiently alleged that the Images used by Club

---

[1] In the context of Georgia's libel statute, "'malice' means ill will, and 'malicious' denotes statements deliberately calculated to injure." Straw v. Chase Revel, Inc., 813 F.2d 356, 362 (11th Cir. 1987). In all actions for printed or spoken defamation, malice is inferred from the character of the charge but may be rebutted by proof. O.C.G.A § 51-5-5. Additionally, for Georgia's common law (or "legal") malice, "proof that the writing is false, and that it maligns the private character or mercantile standing of another, is itself evidence of legal malice." Lucas v. Cranshaw, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008) (internal citation omitted). Here, Defendants have failed to appear (and, accordingly, have not rebutted any allegation), and, additionally, for the reasons discussed below, Plaintiffs have sufficiently alleged maliciousness in asserting that Defendants' false Images connecting them to a strip club "malign[] the private character or mercantile standing of another." Id.

Wax were false.  As discussed previously, Plaintiffs claimed (with supportive

photograph exhibits) that Defendants published altered Images of Plaintiffs in

connection with their strip club, representing "that Plaintiffs [were] either

employed by Club Wax, that they endorsed Club Wax, or that they had some

affiliation with Club Wax" and that "[n]one of these representations were true."

[Doc. 1, p. 22].

> Plaintiffs further alleged:
>
> Defendants' publication . . . falsely accuses [each] Plaintiff of having
> acted in a manner – *i.e.*, working as a stripper and/or endorsing a strip
> club – which would subject each Plaintiff to hatred, shame, obloquy,
> contumely, odium, contempt, ridicule, aversion, ostracism,
> degradation, or disgrace, and/or could induce an evil opinion of
> Plaintiffs in the minds of right-thinking persons, and/or could deprive
> each Plaintiff of confidence and friendly intercourse in society.

Id. at 23.  Plaintiff also asserted that Defendants' false Images were defamatory

because they "tend to injure each Plaintiff in her trade, business, and professional

model."  Id. at 24.  Accordingly, Plaintiffs' alleged facts are sufficient to support a

finding that Defendants' publication was defamatory.  See Walker v. Sheehan, 56

S.E.2d 628, 632 (Ga. Ct. App. 1949) (finding that statements which tend to injure

one in his trade, occupation or business are libelous per se).

Turning next to the second element, Plaintiffs asserted that the altered

Images were communicated to the "general public and potential clientele" of Club

Wax without Plaintiffs' permission through its social media and website.   Id. at

22.  Thus, the Court finds that Plaintiffs have sufficiently alleged an unprivileged

communication to a third party.

Third, Plaintiffs must show fault by the defendant amounting to at least

negligence.  In a defamation suit, "[a] plaintiff's status as either a private figure or

a public figure determines the proper standard of liability for the element of fault."

Gettner v. Fitzgerald, 677 S.E.2d 149, 154 (Ga. Ct. App. 2009).  A plaintiff who is

a private figure "must prove that the defendant acted with ordinary negligence."

Id.  "A plaintiff who is a public figure, on the other hand, must meet a more

stringent standard of liability; a public figure must prove by clear and convincing

evidence that the defendant acted with actual malice."  Id.  "Actual malice" in this

context is "not merely spite or ill will, or even outright hatred; it must constitute

actual knowledge that a statement is false or a reckless disregard as to its truth or

falsity."  Atlanta Humane Soc'y v. Mills, 618 S.E.2d 18, 24 (Ga. Ct. App. 2005).

The Court need not resolve the issue of whether Plaintiffs constitute public

or private figures because Plaintiffs have alleged sufficient facts regarding

Defendants' fault under either standard.  Plaintiffs claimed that Defendants

published the Images with *the intent of creating a false impression* that Plaintiffs

were strippers at Club Wax or endorsed the club, which is plausible given

Plaintiffs' allegations that Defendants used their likenesses on promotional materials even though Plaintiffs were not employed by Club Wax and had no other affiliation with it.  [Doc. 1, pp. 22–23].  Thus, the Court finds that this element has been satisfied.

Finally, the court considers the last element of Plaintiffs' defamation claim, which generally involves special damages.  However, in this case, Plaintiffs argue that Defendants' conduct amounts to defamation per se (here, libel per se).  The primary difference between a claim for defamation and a claim for defamation per se is that the latter does not require proof of special damages.  <u>StopLoss Specialists, LLC</u>, 340 F. Supp. 3d at 1350.  In other words, Plaintiffs contend that Defendants' defamatory statements are actionable "irrespective of special harm." <u>Id.</u> at 1346.

"Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality." <u>DiFrancesco</u>, 802 S.E.2d at 72 (quoting <u>Zarach v. Atlanta Claims Ass'n</u>, 500 S.E.2d 1, 5 (Ga. Ct. App. 1998)).  Additionally, libel per se includes "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein." <u>See</u> O.C.G.A. § 51-5-4(a)(1), (3); <u>Cottrell v. Smith</u>, 788 S.E.2d 772, 781 (Ga. 2016) (explaining that "the requirements for slander per se apply to libel per se because . . . the definition of slander in Georgia

has been incorporated into the definition of libel"); see also Walker, 56 S.E.2d at 632 ("[S]tatements which tend to injure one in his trade, occupation or business have been held to be libelous per se, and no allegation of special damage need be made to support an action for libel or slander based on such statements.").

Here, Plaintiffs alleged that the ads depicting Plaintiffs as strippers

> would tend to injure each Plaintiff in her trade, business, and profession as a professional model. This is because any company or brand that sought to hire any of the Plaintiffs as a company or brand representative would be less likely to do so upon learning that she was a professional stripper and/or promoting [a] strip club, an inference which Defendants' publication of Images support.

[Doc. 1, p. 24].  Thus, Plaintiffs have sufficiently pled defamation per se, and no special harm allegations are required.

* * *

For the foregoing reasons, Plaintiffs' Amended Motion for Default Judgment [Doc. 20] is **GRANTED**.  The Court will next consider Plaintiffs' requested relief.

## III.    Relief

### a.  Damages

Although a defaulted defendant is deemed to have admitted well-pleaded allegations of fact with respect to its liability, the Court must still determine the amount and character of damages to be awarded.  Frazier v. Absolute Collection

Serv., Inc., 767 F. Supp. 2d 1354, 1365 (N.D. Ga. 2011) (citing Virgin Records Am., Inc. v. Lacey, 510 F. Supp. 2d 588, 593 n.5 (S.D. Ala. 2007)).  When assessing default judgment damages, the Court "has an obligation to assure that there is a legitimate basis for any damage award it enters" and not "a completely unreasonable or speculative amount of damages with no factual basis." Anheuser Busch, Inc. v. Philpot, 317 F.3d 1264, 1266 (11th Cir. 2003); see also PNCEF, LLC v. Hendricks Bldg. Supply LLC, 740 F. Supp. 2d 1287, 1294 (S.D. Ala. 2010) ("Rather than merely telling the Court in summary fashion what its damages are, a plaintiff seeking default judgment must show the Court what those damages are, how they are calculated, and where they come from.").

Under the Lanham Act, Plaintiffs may recover (1) defendant's profits, (2) any damages sustained by the plaintiff and (3) the costs of the action.  15 U.S.C. § 1117(a).  The Act "vests considerable discretion in the district court." Burger King Corp. v. Mason, 710 F.2d 1480, 1495 (11th Cir. 1983).   Further, "damages may be awarded even when they are not susceptible to precise calculations [w]here the wrong is of such a nature as to preclude exact ascertainment of the amount of damages." Ramada Inns, Inc. v. Gadsden Motel Co., 804 F.2d 1562, 1565 (11th Cir. 1986).  Here, Plaintiffs request an award of damages in the amount of $530,000.  [Doc. 20, p. 11].

In calculating the damages they are owed, Plaintiffs rely on a "fair market valuation" of the Images Defendants published, as determined by their expert, Stephen Chamberlin.  See [Doc. 20-2].  Chamberlin has been a model and talent agent for 35 years.  Id. at 2.  He frequently opines on models' earning potential in similar litigation to support their claim for damages.  See, e.g., Souza v. Nowhere Bottle and Soc. Club, Inc., 2020 WL 13420543, at *4 (S.D. Fla. Feb. 27, 2020) (collecting cases); Canas v. Babe's S., Inc., No. 21CV942, 2023 WL 2885197, at *2 (N.D. Fla. Feb. 22, 2023), report and recommendation adopted, 2023 WL 4352078 (N.D. Fla. July 5, 2023).

In his expert report, Chamberlain provides an opinion on the "compensation the Models would have and should have received for the use of Images by Club Wax."  [Doc. 20-2, p. 4].  To offer this opinion, Chamberlain calculates the fair market value of Defendants' uses of each of the model's Images, attempting to "recreate a negotiation process that did not occur."  Id. at 4, 16.  Chamberlain's fair market valuation is calculated based on "the way in which work in the modeling talent industry is priced," including the following:

> (a) a model's desirability, based on numerous factors, including the demand for her services; (b) a model's work history, such as prior associations, appearances, endorsements, or advertisements; (c) the nature of the business seeking a model's service, the type of product, whether exclusivity is sought, the embarrassment factor from being associated with the advertisement or marketing of certain products, or

similar considerations; (d) the history of the business seeking a model's services, the style, quality and production of previous advertising and promotions, and its hiring of other models and celebrities; (e) exposure, namely how broadly the Model's likeness will be circulated; (f) the type of exposure, or the "usage" of the image, such as advertising, social media, third party promotion, branding, coupon, extra usage, or corporate identity; (g) the length of exposure of usage, the period of use, and any renewals or rollovers; and (h) the nature, duration and location of the actual shoot and production.

Id. at  7–8.

Chamberlin relied on his experience in the industry as well as the Images Defendants used, and each Plaintiff's typical clients, "earning history, development, growth, positioning, experience, current exposure, name recognition, personal publicity, social media profile, market demand, complimentary employment, and other factors determining and effecting earning capacity." Id. at 5.  He also conducted interviews with the Plaintiffs.  Id. at 6.  In estimating the damages for each model, Chamberlin "employed the same approach, methodology, and process that [he] would typically employ when determining what to charge a company or other entity that is interest in hiring models [he] represents." Id. at 8.

Based on the factors described above, Chamberlin first determined the "day rate" for each model, which is the "base rate of compensation  . . . for the [m]odel's

time on the day of the shoot." Id. at 9.[2]  Next, Chamberlin evaluated the "usage"
of the Plaintiffs' Images, which involves assessing the Images' different
"categories of use." Id. at 11–12.  Chamberlin states that this base "day rate" is
generally negotiated per usage. Id. ("A Day Rate for each of the Usages is the
basis of most negotiations in the Model Industry.").  He further explains that usage
for Advertising would be included in "[o]ne day rate total" but that "[a]ll other
Usages will be negotiated additionally." Id. at 12.  Further, images are usually
only allowed to be used for a set time period—typically one year—and rollover
fees (for additional years of use) apply when the usage extends past the agreed-
upon timeframe. Id.

     Under this framework, Chamberlin provides the following damages estimate
for each model:

---

[2] Chamberlin further explains that it is "critical to note that [m]odels do not sell pre-shot images for [a]dvertising," and "all advertising for specific products involve a photo shoot." Id.

| Model | Day Rate | # Images | Usages[3] | Damages |
|-------|----------|----------|-----------|---------|
| CAMPOS | $20,000 | 1 | A, E | $40,000 |
| CHERI | $50,000 | 1 | A, SM, B, C | $200,000 |
| GEIGER | $10,000 | 3 | A, SM, B, C | $110,000 |
| KILLINGS | $10,000 | 1 | A, SM, B, C | $40,000 |
| PINDER | $20,000 | 1 | A, SM | $40,000 |
| ACOSTA | $20,000 | 2 | A, SM, B | $100,000 |
| **TOTAL** | | | | $530,000 |

Id. at 24.

Courts in this circuit have found Chamberlin's methodology suitable for supporting a damages award under the Lanham Act.  See, e.g., Gibson v. Cowboys Saloon Gainesville, LLC, 2020 WL 3055453, at *7 (N.D. Fla. Feb. 5, 2020), report and recommendation approved in part, 2020 WL 1466412 (N.D. Fla. Mar. 25, 2020) (noting that other courts addressing similar claims "have found Mr.

---

[3] In a legend, Chamberlin provides the following explanation for the usage abbreviations:
A – Advertising
SM – Social Media
C – Coupon
B – Branding
TP – Third Party
E – Extra

Chamberlin's 'fair market value' determination to be an adequate method of calculating damages for a defendant's unauthorized use of the identity or persona of a plaintiff as a human being, not a copyrighted image"). The Court likewise finds Chamberlin's methodology to be sufficient in this case and will thus direct the Clerk to enter damages in favor of Plaintiffs in the amount of $530,000.

b. <u>Injunction</u>

Plaintiffs have also requested a permanent injunction. Under the Lanham Act, a district court is authorized to issue an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title." 15 U.S.C. § 1116(a). Additionally, under the Georgia Uniform Deceptive Trade Practices Act, "a person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." O.C.G.A. § 10-1-373.

As a general rule, permanent injunctive relief is appropriate where a plaintiff demonstrates: (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardship favors an equitable remedy; and (4) an

issuance of an injunction is in the public's interest.  <u>Chanel, Inc. v. Besumart.com</u>, 240 F. Supp. 3d 1283, 1290 (S.D. Fla. 2016).  After reviewing Plaintiffs' well-pled allegations, this Court finds that the four factors are satisfied in this case.

First, since the Court has found a violation of § 1125(a), Plaintiffs enjoy a presumption of irreparable harm.  15 U.S.C. § 1116.  Further, Plaintiffs have demonstrated irreparable harm by showing that Defendants' Images have led to confusion about Plaintiffs' associations.  <u>See</u> <u>ABS-CBN Corp. v. Abscbn-teleserye.com</u>, No. 17-61051-CIV, 2017 WL 6947726, at *5 (S.D. Fla. Dec. 27, 2017) ("[I]n trademark cases, 'a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of . . . a substantial threat of irreparable harm.'").  Second, Plaintiffs have no adequate remedy at law if Defendant is permitted to continue using Plaintiffs' images because Plaintiffs "cannot control the quality of what appears to be [their] services in the marketplace."  <u>Id.</u>  It is also generally recognized in trademark infringement cases that "there is not adequate remedy at law to redress infringement."  <u>Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.</u>, 889 F.2d 1018, 1029 (11th Cir. 1989) (citation omitted).

Third, the balance of hardships favors Plaintiffs because an injunction would simply prevent Defendants from using Plaintiffs' images without consent;

Defendants "therefore could suffer no legitimate hardship by being forced to stop that which [they have] no right to do." Tiramisu Int'l LLC v. Clever Imports LLC, 741 F. Supp. 2d 1279, 1288 (S.D. Fla. 2010). On the other hand, Plaintiffs will continue to suffer damages, such as the dilution of their brands, if Defendants are not enjoined from using their images as requested. Finally, the public interest would not be disserved because it will prevent consumer confusion, and "the public deserves not to be led astray by the use of inevitably confusing marks . . . ." Angel Flight of Georgia, Inc. v. Angel Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008) (citing eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). Accordingly, Plaintiffs' request for a permanent injunction is **GRANTED**.

      c.  Attorney's Fees and Costs

Plaintiffs also seek an award of attorney's fees and costs. Starting with attorney's fees, the Lanham Act provides that "[t]he court *in exceptional cases* may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a) (emphasis added). The Eleventh Circuit Court of Appeals has held that "to be an 'exceptional case' under the Lanham Act requires only that a case 'stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated." Tobinick v. Novella, 884 F.3d 1110, 1118 (11th Cir.

2018) (quoting <u>Octane Fitness, LLC v. ICON Health & Fitness</u>, 572 U.S. 545, 554

(2014)).

Plaintiffs do not present any basis for entitlement to attorney's fees in this

case, offering no argument regarding why this case is "exceptional" under the Act.

Further, the Court finds that Defendants' default does not, in and of itself, make the

case "exceptional" within the meaning of the Lanham Act.  <u>See</u> <u>Hunter Residential</u>

<u>Servs., LLC v. AAA Randpro Plumbing, Inc.</u>, No. 16-CV-1311, 2017 WL

1987247, at *6 (M.D. Fla. Feb. 21, 2017) ("A failure to respond does not make the

case exceptional, otherwise every default case would warrant attorney's fees,

which is not supported by the statute.").  And, without the benefit of any argument

by Plaintiffs, the Court has not otherwise determined what circumstances

distinguish this case as one that "stands out from others." <u>Tobinick</u>, 884 F.3d at

1118.  Accordingly, Plaintiffs' request for attorney's fees is **DENIED**.

Turning to the issue of costs, the Lanham Act allows a plaintiff to recover

the "costs of the action" upon establishing a violation under § 1125(a), as Plaintiffs

have here.  <u>See</u> 15 U.S.C. § 1117(a).  Moreover, Plaintiffs, as the prevailing party,

are entitled to recover reasonable costs under Federal Rule of Civil Procedure

54(d).  Accordingly, this Court finds that Plaintiffs are entitled to their costs.

Under this Court's civil local rules, a bill of costs must be filed by the prevailing party within 30 days following entry of judgment.  LR 54.1. Accordingly, Plaintiffs have 30 days from the date of entry of this Order to file their bill of costs.  Plaintiffs are notified that "a bill of costs which is not timely filed will result in the costs not being taxed as a part of the judgment."  Id.

## CONCLUSION

For the reasons stated above, Plaintiffs' Amended Motion for Default Judgment [Doc. 20] is **GRANTED.**

Accordingly, the Clerk is **DIRECTED** to enter judgment in favor of Plaintiffs against Defendants in the following amounts:

- A judgment in favor of Alana Marie Souza a/k/a Alana Campos for $40,000 and against Defendants;

- A judgment in favor of Andra "Ana" Cheri Moreland for $200,000 and against Defendants;

- A judgment in favor of Brenda Geiger for $110,000 and against Defendants;

- A judgment in favor of Jessica "Charm" Killings for $40,000 and against Defendants;

- A judgment in favor of Lucy Pinder for $40,000 and against Defendants;

- A judgment in favor of Rosa Acosta for $100,000 and against Defendants.

**IT IS FURTHER ORDERED** that Defendants, individually and collectively, for themselves and their principals, partners, officers, agents, servants, employees, representatives, successors, and assigns are **PERMANENTLY ENJOINED** from using Plaintiffs' images on their social media pages or in any advertisements or publicity concerning their establishment (or any related establishment), unless they obtain consent to do so in a writing signed by Plaintiffs.

Plaintiffs' request for an award of attorney's fees is **DENIED**. Plaintiffs shall file a bill of costs consistent with this Court's Local Rules within 30 days after the clerk's entry of judgment. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 26th day of August, 2024.

J. P. BOULEE
United States District Judge